**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **MICHAEL ZALETEL, d/b/a** | ) | |
| **i4SOFTWARE,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 1:16-cv-1230** |
| **v.** | ) | |
| | ) | |
| **PRISMA LABS, INC.,** | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Defendant in this trademark infringement action has moved pursuant to Rule 12(b)(2), Fed. R. Civ. P., to dismiss plaintiff's complaint for lack of personal jurisdiction or, in the alternative, to transfer venue pursuant to 28 U.S.C. § 1404. Thus, at issue is the threshold question of personal jurisdiction, namely, whether defendant's distribution of allegedly infringing smart phone and tablet applications through third-party, online stores constitutes a sufficient basis for the exercise of personal jurisdiction over defendant in this forum.

## I.[1]

Plaintiff, Michael Zaletel, a software developer, resides and works in North Carolina where, in 1999, he founded "i4software," a sole proprietorship, through which plaintiff has been developing and selling applications ("apps") for smart phones. In the course of developing and selling apps, plaintiff registered the "Prizmia" mark with the United States Patent and Trademark Office, which mark plaintiff uses in connection with his  "Prizmia" app.[2] The "Prizmia" app

---

[1] The facts recited below are derived from plaintiff's complaint and the documents submitted in connection with defendant's motion to dismiss for lack of personal jurisdiction, which are properly considered at the Rule 12(b)(2) stage. *See Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016).

allows users to apply "filters" to photographs and videos, which filters have the effect of modifying images. Plaintiff sells its "Prizmia" app through the Apple App Store for 99 cents.

Defendant, Prisma Labs, Inc., is a software company that is incorporated in Delaware but based in Moscow, Russia. Indeed, most of defendant's employees live in Russia. Defendant also has a recently-opened office in Sunnyvale, California, in the Bay Area, populated by two recently-hired software developers. The record is unclear whether defendant hired these software developers as employees or independent contractors, but there is no question that defendant hired one of these developers one month before plaintiff filed suit, and hired the other developer two months *after* plaintiff brought this action. Although defendant contends that its United States headquarters are in Sunnyvale, California, the record suggests that defendant is not registered to do business in California.

In June 2016, defendant launched a photo-filtering app, called "Prisma," which is available for download without charge on the Apple App Store and the Google Play Store. This app is designed for devices using Apple's iOS and Google's Android operating systems. From June 2016 to October 2016, defendant's app has been downloaded approximately 70 million times. Plaintiff alleges that defendant, through defendant's use of the "Prisma" mark, infringes on plaintiff's registered "Prizmia" mark.

Pertinent to the jurisdictional analysis, the record reflects that individuals, by using defendant's "Prisma" app, occasionally send their photographs or videos to one of defendant's

---

[2] Specifically, plaintiff is the owner of the federally registered trademark Prizmia®, Reg. No. 4,682,035, which was registered on the Principal Register of the U.S. Patent and Trademark Office ("USPTO") on February 3, 2015, for "downloadable software for use with mobile electronic devices for the purpose of photo and video capturing and editing" and "downloadable software in the nature of a mobile application for photo and video capturing and editing," in International Class 9.

servers located outside of Virginia. In such instances, defendant's server processes and filters the user's photographs or videos, and then returns the images to the user's device.[3] Importantly, however, the record discloses that defendant's servers do not know where an app user's device is located when the user's device sends a request to, or otherwise communicates with, the servers. Nor do defendant's servers know where an app user's device is located when the servers return filtered images to the user.

In addition, defendant operates a website, http://prisma-ai.com, which contains information about defendant's "Prisma" app. This app is not available for download directly on defendant's website; rather, defendant's website includes links to the Apple App Store and the Google Play Store. If a user clicks through these links, that user could then download defendant's app from the third-party distributor. Defendant's website also includes links to various news articles about defendant's app, articles in which defendant's CEO and other employees have been quoted, as well as an email address for defendant. It is worth noting too, that defendant's website is passive and simply displays information. For instance, the website does not permit visitors to create an account to use the site (or to use defendant's app), nor does the website provide any sort of forms that a user could fill out, such as warranty forms. Nor is there anything on the website specifically targeting or singling out Virginia.

Finally, it is worth noting the following:

- Defendant's app itself does not require an individual in the United States to create an account in order to use the app.

---

[3] Plaintiff acknowledges that defendant recently changed its software so that some filters can be applied on a user's device, without having to contact defendant's servers. There is no dispute, however, that some of defendant's filters still require users to send images to defendant's servers.

3

- Defendant does not know how many app users are in Virginia, as defendant does not count or keep track of the number of app-users in Virginia or in any other specific location.

- Defendant's contracts with the third-party distributors (the Apple App Store and Google Play Store) are enforceable under states other than Virginia.

- Defendant does not have any offices, employees, or contracts in Virginia.

- Defendant does not have an established communication network with Virginia consumers.

- Defendant does not market or advertise its app in Virginia, aside from defendant's website, which is generally accessible throughout the United States.

- Any software updates to the app are made available by the third-party distributors.

- Defendant did not design its app specifically for any State's regulations.

## II.

Because defendant has timely filed a Rule 12(b)(2) motion, analysis properly begins with the question of personal jurisdiction. Once a defendant has raised a timely Rule 12(b)(2) motion, a plaintiff "bears the burden of demonstrating personal jurisdiction at every stage following such a challenge." *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016). Yet, a plaintiff's burden of persuasion depends on the case's procedural posture. For instance, a plaintiff must satisfy a prima facie standard "when the court addresses the personal jurisdiction question by reviewing only the parties' motion papers, affidavits attached to the motion, supporting legal memoranda, and the allegations in the complaint[.]" *Id.* at 268. In such circumstances, "the court must take the allegations and available evidence relating to personal jurisdiction in the light most favorable to the plaintiff." *Id.*[4]

---

[4] By contrast, if a pretrial evidentiary hearing is held, a plaintiff must "prove facts supporting personal jurisdiction by a preponderance of the evidence." *Grayson*, 816 F. 3d at 268.

Under Fourth Circuit law, resolution of a personal jurisdiction challenge involves a two-step inquiry. *See Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 558 (4th Cir. 2014). The first step is to determine whether Virginia's long-arm statute, Va. Code § 8.01–328.1, by its terms, reaches defendant's conduct. If the long-arm statute does not reach defendant's conduct, the inquiry ends; there is no personal jurisdiction over defendant. *See id.* But if the long-arm statute, by its terms, reaches defendant's conduct, then analysis turns to the second step—the due process inquiry—to determine whether the long-arm's reach exceeds its constitutional grasp. *Id.*; *see also AESP, Inc. v. Signamax, LLC*, 29 F. Supp. 3d 683, 688 (E.D. Va. 2014) (describing this two-step process). Moreover, when a provision of the Virginia long-arm statute is held to permit the exercise of personal jurisdiction over a defendant to the outer limits allowable under federal due process, this two-prong test merges into the constitutional inquiry. *See Tire Eng'g v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 301 (4th Cir. 2012) ("Because Virginia's long-arm statute extends personal jurisdiction to the outer bounds of due process, the two-prong test collapses into a single inquiry when Virginia is the forum state.").

The Virginia long-arm statute provides for *in personam* jurisdiction over any person who "transact[s] any business" in Virginia, or who causes "tortious injury" in Virginia by an act or

---

Significantly, an evidentiary hearing "does not *automatically* involve or require live testimony." *Id.* (emphasis in original). Rather, "an evidentiary hearing requires only that the district court afford the parties a fair opportunity to present both the relevant jurisdictional evidence and their legal arguments." *Id.* (quotation marks omitted). Thus, the Fourth Circuit has declined "to impose on a district court the hard and fast rule that it must automatically assemble attorneys and witnesses when doing so would ultimately serve no meaningful purpose." *Id.* at 269. Indeed, a district court may, in lieu of taking live testimony, "consider evidence in the form of depositions, interrogatory answers, admissions, or other appropriate forms." *Id.* at 268-69. Here, the distinction between an "evidentiary hearing" and a ruling on the review based solely on the complaint, motions papers, and related documents is of no moment, because plaintiff fails to make a prima facie showing of personal jurisdiction.

omission outside of Virginia if that person (i) regularly does or solicits business in Virginia, (ii) engages in any other persistent course of conduct in Virginia, or (iii) derives substantial revenue from goods used or consumed or services rendered in Virginia. Va. Code. §§ 8.01-32.1(A)(1) & (4).[5] Because these provisions have been interpreted as extending to the limits permitted by the Due Process Clause, this analysis turns to the constitutional due process inquiry.[6] Simply put, neither long-arm provision constitutionally reaches defendant's conduct in this case.

As the Fourth Circuit has recently noted, "[p]ersonal jurisdiction over persons conducting business on the Internet is determined under a [constitutional] standard that has evolved as necessary to accommodate the nature of the Internet." *Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 328 (4th Cir. 2013). That constitutional standard starts with the well-entrenched principle that a defendant must "have certain minimum contacts with [the forum] such that the maintenance of a suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quotation marks omitted). Personal jurisdiction can be established under either general or specific jurisdiction.[7] Where, as here, a defendant's alleged contacts with the forum also constitute the asserted basis for the suit,

---

[5] *Cf. Alitalia-Linee Aeree Italiane S.p.A. v. Casinoalitalia.com*, 128 F. Supp. 2d 340 (E.D. Va. 2001) ("[T]rademark infringement is a tort.").

[6] *See, e.g.*, *Consulting Eng'rs Corp v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009) ("Because Virginia's long-arm statute is intended to extend personal jurisdiction to the extent permissible under the due process clause, the statutory inquiry merges with the constitutional inquiry."); *English & Smith v. Metzger*, 901 F.2d 36, 38 (4th Cir. 1990) ("[I]n defining the term transacting business, we are mindful that the purpose of the Virginia long-arm statute is to extend jurisdiction to the extent permissible under the due process clause.").

[7] *See, e.g.*, *Helicopteros Nacionales de Colombia S.A. v. Hall*, 466 U.S. 408, 414 (1984); *Universal Leather*, 773 F.3d at 559; *Tire Eng'g v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 301 (4th Cir. 2012).

analysis properly focuses on specific jurisdiction. *See Tire Eng'g*, 682 F.3d at 301 (where plaintiff "argues only that the court possess[es] specific jurisdiction over [defendants] . . . our analysis is confined to that model"). In this regard, the Fourth Circuit has adopted a three-part inquiry "to determine whether a defendant is subject to jurisdiction in a State because of its electronic transmissions to that State." *Chernuk*, 716 F.3d at 328. Specifically, "the inquiry considers: (1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the forum state; (2) whether the plaintiff's claims [arose] out of those activities; and (3) whether the exercise of personal jurisdiction is constitutionally reasonable." *Id.* (quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002).[8]

This first prong—"purposeful availment"—is "grounded on the traditional due process concept of 'minimum contacts,' which itself is premised on the basis that 'a corporation that

---

[8] Put differently, "a State may, consistent with due process, exercise judicial power over a person outside of the State when that person (1) directs electronic activity into the State, (2) with the manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts." *ALS*, 292 F.3d at 714.

Notably, the Fourth Circuit in *ALS* "adopt[ed] and adapt[ed]" the well-known *Zippo* "sliding scale" approach for determining when a defendant's internet contacts with a State could confer personal jurisdiction over that defendant. Specifically, the *Zippo* model focused on a spectrum of activities involving, on one end, situations where "the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet" and, on the other end, "passive" websites on which defendants merely "post[] information . . . accessible to users in foreign jurisdictions." *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997). Importantly, the Fourth Circuit placed even greater emphasis on a defendant's intent to engage in business within the forum State than did the *Zippo* court. Thus, it is appropriate to note that

> [a] comparison of [the *ALS* test] to the original *Zippo* test indicates that the *ALS* test emphasizes that requirement of *purposeful* targeting of a particular forum, not just the level of interactivity. Under the *ALS* test, the defendant must *direct* activity into the forum state, with the *intent* to engage in business *within the state.*

*Graduate Mgmt. Admission Council v. Raju*, 241 F. Supp. 2d 589, 595 (E.D. Va. 2003) (emphasis in original).

enjoys the privilege of conducting business within a state bears the reciprocal obligation of answering to legal proceedings there.'" *Universal Leather*, 773 F.3d at 559 (quoting *Tire Eng'g*, 682 F.3d at 301). Therefore, "in determining whether a foreign defendant has purposefully availed itself of the privilege of conducting business in a forum state, [courts] ask whether 'the defendant's conduct and connection with the forum [s]tate are such that he should reasonably anticipate being haled into court there.'" *Id.* (quoting *Fed. Ins. Co. v. Lake Shore Inc.*, 886 F.2d 654, 658 (4th Cir. 1989). Crucially, to satisfy this standard, "a defendant outside the forum State must have at least 'aimed' its challenged conduct at the forum State." *Chernuk*, 716 F. 3d at 328 (quoting *Calder v. Jones*, 465 U.S. 783, 789 (1984)).

Moreover, where, as here, defendant is a foreign corporation that (i) "has no presence in Virginia" and (ii) "did not itself sell products into Virginia," then "plaintiff[,] to establish personal jurisdiction over defendant, must rely on the 'stream of commerce' theory[.]'" *AESP*, 29 F. Supp. 3d at 689.[9] In this regard, the Fourth Circuit has explained,

---

[9] The Supreme Court first adopted the "stream of commerce" theory in *World-Wide Volkswagen Corp. v. Woodson*, holding that a defendant corporation may "purposefully avail" itself of the privilege of conducting business in the forum state if the defendant corporation "delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." 444 U.S. 286, 297-98 (1980). Yet, the Supreme Court has split on what the "stream of commerce" theory requires. *See Asahi Metal Indus. v. Superior Court*, 480 U.S. 102 (1987). A four-Justice plurality, led by Justice O'Connor, concluded that that placing a product in the stream of commerce provides personal jurisdiction only if that placement was "an action of the defendant *purposefully directed* at the forum State." *Id.* at 112 (emphasis added). In other words, mere placement of a product into the stream of commerce, without more, is not an act purposefully directed toward a forum state, even when the non-resident defendant is aware that the product ultimately will enter the forum state. By contrast, Justice Brennan's concurrence—which was joined by three other Justices—concluded that an additional showing of purposefulness was unnecessary because "[a]s long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise." *Id.* at 117. The Fourth Circuit has rejected Justice Brennan's approach and has edged towards Justice O'Connor's. *See, e.g.*, *Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939 (4th Cir. 1994).

> The touchstone of the minimum contacts analysis remains that an out-of-state person has engaged in some activity purposefully directed toward the forum state. . . . To permit a state to assert jurisdiction over any person in the country whose product is sold in the state simply because a person must expect that to happen destroys the notion of individual sovereignties inherent in our system of federalism.

*Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939, 945 (4th Cir. 1994) (citations omitted). Indeed, the Fourth Circuit has reaffirmed that placing products into the stream of commerce "with the expectation that they would be purchased in [the forum state]" is not enough to constitute "activity purposefully directed" at that forum state. *In re Celotex Corp.*, 124 F.3d 619, 629 (4th Cir. 1997). As the Fourth Circuit has put it, this approach is necessary to "ensure that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Chernuk*, 716 F.3d at 328 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

The Fourth Circuit's approach to the stream of commerce theory is essentially the same with respect to a defendant's internet contacts. *See ALS*, 293 F.3d at 714-15.[10] Importantly, "[u]nder this standard, a person who simply places information on the Internet does not subject himself to jurisdiction in each State into which the electronic signal is transmitted and received." *Id.* at 714. In the Fourth Circuit's view, "[s]uch passive Internet activity does not generally include directing electronic activity into the State with the manifested intent of engaging business or other interactions in the State thus creating in a person within the State a potential cause of action cognizable in courts located in the State." *Id.*

---

[10] There, the Fourth Circuit concluded that a defendant "purposefully avail[s] itself of the privilege of conducting business or other transactions in [the forum State]" where the defendant "directs electronic activity into the State . . . with the manifested intent of engaging in business or other interactions within the State[.]" *ALS*, 293 F.3d at 714-15.

Relatedly, the Supreme Court recently underscored that a defendant's relationship to the forum state "must arise out of contacts that 'the defendant *himself*' creates with the forum state." *Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014) (quoting *Burger King*, 471 U.S. at 475). The *Walden* Court further emphasized that the "minimum contacts analysis looks to the defendant's contacts with the *forum State itself*, not the defendant's contacts with *persons who reside there*." *Id.* (emphasis added). Thus, "[d]ue process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." *Id.* (quoting *Burger King*, 471 U.S. at 475).

## III.

These principles, applied here, point persuasively to the conclusion that defendant has not "purposefully availed" itself of the privilege of conducting business in Virginia, and thus defendant is not subject to specific personal in this forum.

Distilled to its essence, plaintiff's argument for jurisdiction is (i) that defendant distributes its Prisma app to Virginia users via downloads through Apple and Google's online app stores; (ii) that defendant distributes its Prisma app through defendant's website, http://prisma-ai.com, which links individuals directly to the Apple and Google stores; and (iii) that defendant processes images on servers outside of Virginia and sends the processed images (via defendant's Prisma app) to a Virginia user's device.

In response, defendant contends that plaintiff cannot make a prima facie showing that defendant purposefully availed itself of the privilege of conducting business in Virginia. Specifically, defendant argues (i) that defendant's website is passive and does not target or focus on Virginia consumers, (ii) that defendant's app is indirectly distributed through third-party app

stores, not defendant, and (iii) that the alleged electronic communications between defendant's servers and Prisma app users is not "purposefully directed" at Virginia, but rather these are random, attenuated, and fortuitous user-initiated contacts. In this last respect, defendant stresses that defendant's servers are unaware of the user's physical address, and that the user has unilateral control over where the user is located when communicating with the server; put differently, the user determines whether the contact will occur in Virginia or any other state, and thus these communications are not directed at the forum State, specifically.

To begin with, the case most apposite to the parties' lawsuit—*Intercarrier Commc'ns LLC v. WhatsApp Inc.*—supports the conclusion that Virginia lacks personal jurisdiction over defendant. *See* No. 3:12-cv-776, 2013 WL 5230631 (E.D. Va. Sept. 13, 2013) (holding that plaintiff failed to make a prima facie showing of personal jurisdiction).[11] In *WhatsApp*, the plaintiff filed a patent infringement suit against a Delaware corporation headquartered in California. Defendant's sole product was a phone app, "WhatsApp Messenger," which allowed its 200-300 million users to send and receive text, picture, audio, and video messages over an internet connection rather than through a phone carrier's network. The *WhatsApp* defendant's

---

[11] Because *WhatsApp* involved patent claims, Federal Circuit law applied to the personal jurisdiction issue. Importantly, however, the Federal Circuit's due process test for personal jurisdiction is essentially similar to the Fourth Circuit's. *Compare WhatsApp*, 2013 WL 5230631, at *3 ("The Federal Circuit applies a three-prong test to determine if specific jurisdiction exists: (1) whether the defendant purposefully directed activities at residents of the forum; (2) whether the claim arises out of or relates to those activities; and (3) whether assertion of personal jurisdiction is reasonable and fair. . . . To satisfy the first prong, it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State" (quotation marks omitted)), *with Chernuk*, 716 F.3d at 328 (Fourth Circuit's jurisdictional inquiry considers "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the forum state; (2) whether the plaintiff's claims [arose] out of those activities; and (3) whether the exercise of personal jurisdiction is constitutionally reasonable.").

app was primarily available for download on third-party websites (such as the Apple iTunes Store), and users paid 99 cents per year for that defendant's app. The defendant, however, did not directly receive payment; instead, the third-party app stores processed payments and transmitted a portion of those payments to the defendant. *Id.* at *1, *4.

The *WhatsApp* plaintiff claimed that the defendant had purposefully availed itself of the privilege of conducting business in Virginia, contending (i) that the *WhatsApp* defendant had introduced its infringing product into the stream of commerce "knowing that [the product] would be sold in [the Eastern District of Virginia] and elsewhere in the United States," *id.* at *1; (ii) that the defendant "'consciously" or "deliberately" targeted Virginia because Virginia users downloaded or used the defendant's software within that forum, *id.* at *4; and (iii) that individuals in Virginia could "share" their location while using that defendant's app, *id.*

In addition, although the *WhatsApp* defendant had no offices, employees, contracts, or advertisements in Virginia, that defendant admitted (i) that users of certain smartphone operating systems could download the defendant's app directly from the defendant's website; (ii) that the defendant's servers stored information on its users' telephone numbers, (iii) that the defendant's servers may have "store[d] undelivered messages which may contain a user's location if the user actively elects to send such a message with their user location, but such information [wa]s held only as long as necessary to deliver the message," (iv) that the defendant stored non-user telephone numbers obtained from its users' address books in a way that defendant was "unable to retrieve them in their original form," (v) that the defendant "store[d] minimal identifying data about its customers"; and (vi) that some individuals had ordered and used the defendant's app while in Virginia. *Id.* at *1.

Crucially, the *WhatsApp* court held that the plaintiff failed to make a prima facie showing that the defendant had "purposefully availed" itself of the privilege of conducting business in Virginia. *Id.* at \*5. In reaching this conclusion, the *WhatsApp* court explicitly rejected plaintiff's argument "that a company 'consciously' or 'deliberately' targets a forum if a user unilaterally downloads or uses its software within that forum[.]" *Id.* at \*4. This was so even though a Virginian could download defendant's product directly from defendant's website, and that the defendant stored identifying data about its customers.

The *WhatsApp* reasoning, applied here, points persuasively to the conclusion that there is no personal jurisdiction over defendant Prisma Labs. In fact, defendant in this case has even fewer contacts with Virginia than did the defendant in *WhatsApp*; unlike the defendant in *WhatsApp*, Prisma Labs (i) does not know the location of its app users, (ii) does not make its app available for download directly on defendant's website, (iii) does not charge customers (either through a third-party app store or directly) to download the app, and (iv) does not store information about its users or permit users to "share" locations. Thus, if there was no prima facie showing of purposeful availment in *WhatsApp*, it follows *a fortiori* that there is no prima facie showing in the instant case .

Seeking to avoid this result, plaintiff contends that *WhatsApp* is distinguishable from the instant case because, unlike the defendant in *WhatsApp*, Prisma Labs has a  "real time relationship [with] its users by which Prisma processes and returns [users'] images from [defendant's] remote servers." P. Br. (Doc. 38) at 17. Even when all reviewable documents are viewed in the light most favorable to plaintiff, it is pellucid that defendant's servers do not target Virginia, because the users who initiate contact with the server unilaterally control the location

where the server's response will wind up.[12] In this respect, defendant's activity is purposefully directed at the *individual user*, regardless of where that user is. Thus, defendant's (and its server's) contact with Virginia—as opposed to any other State—is entirely fortuitous and did not "arise out of contacts that the defendant [itself] create[d] with the forum *State*." *Walden*, 134 S. Ct. at 1121–22. To hold otherwise would flout the Supreme Court's direction that the minimum contacts analysis must "look[] to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id.* at 1122.

This result finds further support in another recent case, *AESP, Inc. v. Signamax, LLC*, where a plaintiff's suit against a Czech LLC for trademark and copyright infringement was dismissed for lack of personal jurisdiction. *See* 29 F. Supp. 3d 683 (E.D. Va. 2014). The defendant in *AESP* was in the business of selling network connection components and cabling products. Plaintiff asserted that jurisdiction existed over the defendant based on four transactions in which defendant's authorized agent sold the allegedly infringing products to a Pennsylvania corporation, which subsequently sold those products to two customers in Virginia. *Id.* at 690. On these facts, the application of Fourth Circuit law and the "stream of commerce" theory required the conclusion that no personal jurisdiction existed over that defendant. *Id.* at 691. This was so because the defendant "did not *direct* the sales of its products to Virginia or any Virginia customers, nor did it *require* [its authorized agent] to sell the products to Virginia customers." *Id.* at 690 (emphasis added). Rather, "the record reflect[ed] no more than that defendant might

---

[12] *See, e.g.*, *Advanced Tactical Ordinance Sys. LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 803 (7th Cir. 2014) (noting in the analogous context of emails that "[t]he connection between the place where an email is opened and a lawsuit is entirely fortuitous" because "email does not exist in any location at all; it bounces from one server to another, it starts wherever the account-holder is sitting when she clicks the "send" button, and it winds up wherever the recipient happens to be at that instant").

expect that the products would eventually be sold somewhere in the United States, including Virginia." *Id.* at 690-91. In this regard, "no evidence in the record . . . reflect[ed] that defendant *specifically* structured its relationship with . . . its U.S. distributor, in order to facilitate the sale of the allegedly infringing products in Virginia." *Id.* (emphasis added). Nor was there "any evidence that defendant marketed the allegedly infringing products in Virginia or advertised in Virginia." *Id.* at 691 (emphasis added). Indeed, "[d]efendant's only contact with Virginia appear[ed] to be its sales to a nationwide distributor." *Id.* Importantly, however, personal jurisdiction could not be exercised based on "the mere presence of defendant's product in Virginia . . . when it was [defendant's distributor], not defendant, that sold the products into Virginia." *Id.*

Although *AESP* involved substantially fewer sales than the instant case does downloads, the logic in *AESP* directly maps onto the case at bar. Indeed, the record here reflects no more than that defendant might expect its "Prisma" app would eventually be downloaded in the United States, including Virginia. There is nothing in the record plausibly to suggest that defendant structured its relationship with its third-party distributors to require—or even facilitate—app downloads specifically in Virginia. And defendant's distributor, not defendant, makes the app available for download to a user's device. Put simply, defendant has merely used nationwide app stores to place defendant's product in the stream of commerce, without targeting or directing its activity toward Virginia in particular. *Cf. id.* at 690-91.[13]

---

[13] Plaintiff's only reply to *AESP* is the same argument that plaintiff used when addressing *WhatsApp*—plaintiff again focuses on the fact that defendant "process[es] [user] images with Prisma's servers," which plaintiff considers to be an "ongoing service relationship with [defendant's] customers." P. Br. (Doc. 38) at 15. Once again, this argument is unpersuasive for the reasons already stated.

Thus, given Fourth Circuit precedent and the logic elucidated in apposite cases, there is no personal jurisdiction over defendant.

Seeking to avoid this result, plaintiff relies primarily on two decisions, both of which involved crucially different facts from those presented here. First, plaintiff points to *Match.com, L.L.C. v. Fiesta Catering Int'l, Inc.*, No. 1:12-cv-368, 2013 WL 428056 (E.D. Va. Jan. 31, 2013). But that case does not aid plaintiff. The court in *Match.com* concluded that jurisdiction existed over a defendant that (i) maintained an interactive dating website that would "match" users with each other, (ii) required users to register accounts, agree to Terms and Conditions, and pay a monthly fee to use the website, (iii) had an ongoing relationship with paid subscribers residing in Virginia by, *inter alia*, offering commissions to Virginia residents to refer new subscribers to the defendant's website, and (v) specifically targeted the Virginia market by "prominently advertising the number of members it has in a given geographic area within Virginia." *Id.* at *1, *4. Thus, plaintiff's reliance on *Match.com* is misplaced, as defendant Prisma Labs' internet contacts with Virginia are far more attenuated; indeed, defendant's contacts with Virginia are entirely fortuitous.

Second, plaintiff relies on *Jones v. Boto*, 498 F. Supp. 2d 822 (E.D. Va. 2007), but that case is also inapposite. In *Boto*, the defendant sold artificial trees to Wal-Mart and Target stores throughout the U.S., including Virginia. *Id.* at 829. To begin with, the *Boto* court noted that the defendant's sales to Virginia Wal-Mart and Target branches would have been insufficient to confer personal jurisdiction under the stream of commerce theory. *Id.* at 828-29. Importantly, however, the defendant in *Boto* also maintained a website accessible in Virginia where consumers could (i) retrieve information about the trees those consumers bought, and, (ii) complete warranty registration forms. *Id.* Indeed, the *Boto* court noted that the defendant's

website was designed to provide services to consumers in Virginia. *Id.* The court in *Boto* also noted that the record supported a prima facie finding of jurisdiction in light of the defendant's "regular course of dealing that resulted in deliveries of substantial quantities and dollar amounts of products into Virginia on an annual basis over a period of at least several years." *Id.* at 830 n.10.

In these respects, *Boto* is distinguishable from the case at bar. Here, defendant's website does not provide a service to app users, nor does defendant's website contain anything similar to the warranty registration forms present in *Boto*. Moreover, the *Boto* defendant's contacts with the forum were far less attenuated, fortuitous, and unilateral than those in the instant case. Indeed, in *Boto*, the defendant's trees necessarily were physically in Virginia when purchased at Virginia Wal-Mart and Target branches—thus, a purchaser, in order to buy a tree from a Virginia Wal-Mart or Target, necessarily had to engage in a transaction with a Virginia store in Virginia. Put differently, the purchasers in *Boto* did not have unilateral control over where the transactions with the defendant occurred. By contrast, defendant's "Prisma" app, which has been available for fewer than six months, is purchased in Virginia only when a user elects to download defendant's app while that user happens to be located in Virginia.

In sum, plaintiff has not made a prima facie showing that defendant purposefully availed itself of the privilege of conducting business in Virginia, and thus there is no personal jurisdiction over defendant in this forum.

## IV.

Analysis thus turns to the issue of transfer. Although defendant moved to transfer the matter to the Northern District of California pursuant to 28 U.S.C. § 1404(a), which permits

transfer "[f]or the convenience of the parties and witnesses,"[14] section 1404 is inapplicable because there is no personal jurisdiction over defendant.[15] Importantly, however, plaintiff, an individual entrepreneur based in North Carolina, selected the Eastern District of Virginia as the forum for this suit to obtain a prompt resolution of the underlying trademark infringement claims, as plaintiff contends that defendant's expansive and infringing use of plaintiff's mark is rapidly causing plaintiff irreparable harm. Given this, plaintiff prefers transfer to dismissal, but opposes a cross-country transfer. Thus, it is appropriate to consider whether transfer to defendant's state of incorporation—Delaware—may be effective pursuant to 28 U.S.C. §§ 1406 and 1631.

Specifically, § 1406 provides for transfer of "a case laying venue in the wrong division or district" to "any district or division in which [the case] could have been brought" if transfer is "in the interest of justice." 28 U.S.C. § 1406(a). Although § 1406 speaks only of transfer on the ground of improper venue, § 1406 may be implemented in the Fourth Circuit to effect transfer of a case for lack of personal jurisdiction.[16] Similarly, § 1631 provides an independent ground to

---

[14] 28 U.S.C. § 1404(a).

[15] Even assuming the existence of personal jurisdiction over defendant, transfer to the Northern District of California pursuant to § 1404(a) would be inappropriate on this record. There is no reliable indication in the record identifying the number of witnesses or the materiality of their testimony; hence, in this respect, there is no way to evaluate inconvenience to the witnesses or parties. And the fact that defendant's recent headquarters appear to be in California is not a persuasive basis for a § 1404 transfer, because sending the case to the Northern District of California would merely shift the balance of inconvenience from defendant to plaintiff. Moreover, the interests of justice would not be served by such a transfer, because delay in the disposition of this case would ensue, as the docket in the Northern District of California appears to be slower than the docket in the Eastern District of Virginia.

[16] At first blush, it appears that § 1406, by its text, applies only to transfers based on improper *venue*. The Fourth Circuit, however, has interpreted § 1406 broadly to permit transfer for lack of personal jurisdiction, as well. *See, e.g., Porter v. Groat*, 840 F.2d 255, 258 (4th Cir. 1988)

transfer this case to "any other such court in which the action . . . could have been brought at the time it was filed" if "there is a want of jurisdiction" in the Eastern District of Virginia and transfer is "in the interest of justice." *Id.* § 1631. Notably, § 1631 may be invoked when there is a lack of either personal or subject matter jurisdiction.[17] Thus, to transfer a case pursuant to § 1631, "a court must find that (1) the proposed transferee court has jurisdiction, (2) the action would have been timely filed had it been brought initially in the transferee court, and (3) transfer would serve the interests of justice." *Afifi v. U.S. Dept. of Interior*, 924 F.2d 61, 64 n.6 (4th Cir. 1991).

It is also important to note that "district courts 'generally favor transfer over dismissal, unless there is evidence that a case was brought in an improper venue in bad faith or to harass defendants.'" *Cont'l Cas. Co. v. Argentine Republic*, 893 F. Supp. 2d 747, 754 (E.D. Va. 2012) (quoting *Gov't of Egypt Procurement Office v. M/V Robert E. Lee*, 216 F. Supp. 2d 468, 473 (D.

---

("[W]e adopt as the rule in this circuit the reading of § 1406(a) that authorizes the transfer of a case to any district, which would have had venue if the case were originally brought there, for any reason which constitutes an impediment to a decision on the merits in the transferor district but would not be an impediment in the transferee district."); *Robertson v. Northcutt*, 850 F.2d 690 (4th Cir. 1988) (Table Decision) (finding reversible error where district court lacking personal jurisdiction over defendant failed to transfer case pursuant to § 1406); *DeSantis v. Hafner Creations, Inc.*, 949 F. Supp. 419, 427 (E.D. Va 1996) ("Notwithstanding the absence of personal jurisdiction, federal courts have the power to transfer matters in the interests of justice under 28 U.S.C. § 1406(a)."). This interpretation of § 1406 is consonant with the Supreme Court's view. *See Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 466 (1962) (district court lacking personal jurisdiction over a defendant may transfer the case under § 1406(a)).

[17] *See, e.g.*, *In re Carefirst of Md., Inc.*, 305 F.3d 253, 262 & n.2 (4th Cir. 2002) (holding that a § 1631 transfer order was not reviewable on appeal under the collateral order doctrine and declining to join circuit split on applicability of § 1631 to cases involving want of personal jurisdiction); *Fed. Home Loan Bank of Bos. v. Moody's Corp.*, 821 F.3d 102, 114 (1st Cir. 2016) (demonstrating through a compelling and thorough analysis that § 1631 "encompasses both personal and subject matter jurisdiction"); *Chavez v. Dole Food Co.*, 836 F.3d 205, 224 (3d. Cir. 2016) (*en banc*) (citing *Moody's* favorably and concluding that "the statutory directive in [§§ 1406 & 1631] is the same" regardless whether the jurisdictional defect stems from a lack of personal or subject matter jurisdiction).

Md. 2002)). This is so because "[t]ransfer would facilitate a more expeditious resolution of the merits of the controversy in a concededly proper forum and would avoid the costs and delay that would result from dismissal and refiling[.]" *Id.* (quoting *Verosol B.V. v. Hunter Douglas, Inc.*, 806 F. Supp. 582, 594 (E.D. Va. 1992)).

Here, it is appropriate, pursuant to 28 U.S.C. §§ 1406 and 1631, to transfer this matter to the United States District Court for the District of Delaware. To begin with, the District of Delaware has general jurisdiction over defendant because defendant is incorporated under the laws of Delaware. *See Daimler AG v. Bauman*, 134 S. Ct. 746, 760 (2014) (noting that an entity's state of incorporation is the "paradigm" forum for general jurisdiction). And because defendant is subject to general personal jurisdiction in Delaware, venue is proper there. *See* 28 U.S.C. § 1391(b)(1) (venue is proper where defendant is a resident); *id.* § 1391(c) (for venue purposes, "an entity with the capacity to sue and be sued in its common name under applicable law . . . shall be deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction"). Thus, there is no question that plaintiff could have originally filed this action in the District of Delaware.

Moreover, transfer to the District of Delaware is in the interest of justice because (i) plaintiff appears to have filed this suit in good faith and with a reasonable basis for believing that the Eastern District of Virginia was a proper forum, and because the parties have an interest in a swift resolution of plaintiff's infringement claims and motion for preliminary injunction,[18] (ii) it is unclear whether any other State besides Delaware would have personal jurisdiction over

---

[18] *See Cont'l Cas. Co.*, 893 F. Supp. 2d at 754 (transfer is favored, unless case was brought in bad faith or to harass defendants, because transfer "facilitate[s] a more expeditious resolution of the merits of the controversy in a concededly proper forum and would avoid the costs and delay that would result from dismissal and refiling").

defendant,[19] (iii) plaintiff is a single entrepreneur residing in North Carolina, and thus it is much more convenient for plaintiff to travel to Delaware than to California, and (iv) it appears that defendants' witnesses and evidence are all located in Moscow, such that defendant will be required to travel regardless where this action is litigated.[20]

In conclusion, in the interests of justice, the matter is appropriately transferred to the District of Delaware pursuant to 28 U.S.C. §§ 1406 and 1631.

## V.

In sum, because the record reflects a lack of personal jurisdiction over defendant, and because the interests of justice counsel in favor of transfer to Delaware pursuant to §§ 1406 and 1631, the matter is appropriately transferred to the United States District Court for the District of Delaware.

An appropriate Order has already issued.

Alexandria, Virginia
December 22, 2016

T. S. Ellis, III
United States District Judge

---

[19] Indeed, the same jurisdictional infirmities preventing Virginia from exercising personal jurisdiction over defendant would likely persist if plaintiff pursued this action in any other State, including plaintiff's home state of North Carolina. It is also unclear whether California would have jurisdiction, particularly because it does not appear that defendant is even registered to do business there, and because defendant's recently-acquired contacts may have been manufactured in response to this lawsuit.

[20] Defendant's recently-acquired office and newly-hired developers in California do not change this analysis, particularly in light of the fact that one of defendant's two California-based developers was hired *after* this litigation began.