## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

MICHAEL ZALETEL, d/b/a I4SOFTWARE,        )
                                          )
       Plaintiff,                         )
                                          )
v.                                        )  Civ. No. 16-1307-SLR
                                          )
PRISMA LABS, INC.,                        )
                                          )
       Defendant.                         )

### MEMORANDUM

At Wilmington this ⎵ day of March, 2017, having reviewed the papers filed in connection with plaintiff's motion for a preliminary injunction, and having heard oral argument on same, the court issues its decision to deny the motion, for the reasons that follow:

1. **Background.** Plaintiff Michael Zaletel, d/b/a i4software ("plaintiff"), is a software developer in North Carolina who operates i4software as a sole proprietorship to develop and market apps for use in the smart phone market. (D.I. 71 at ¶¶ 2, 4) Since 2009, plaintiff has developed over 40 apps for use on Apple iPhones and other devices; at least three have been commercial hits, each generating sales of more than $750,000. (*Id.* at ¶¶ 6-10; ex. 1) In August 2014, plaintiff launched his "Prizmia" app on the Apple App Store; according to plaintiff, the term "Prizmia" was coined for trademark use. (*Id.* at ¶¶ 11-14) When the "Prizmia" app was introduced in 2014, it cost consumers $4.99, a price that was later increased to $7.99.

2. According to plaintiff, he invested 4,900 hours of programmer time valued at $367,500 in developing the "Prizmia" app. (*Id.* at ¶ 19) Plaintiff thereafter engaged in various promotional activities for his app, including marketing and creating a website (www.prizmia.com) (*Id.* at ¶¶ 20-25; exs. 3-5) Plaintiff asserts that, since August 2014, the "Prizmia" app has been downloaded between 15,000 and 20,000 times by customers, "most of whom paid for it." (*Id.* at ¶ 51)

3. Plaintiff is the owner of the federally registered trademark Prizmia®,[1] Reg. No. 4,682,035, which was registered on the Principal Register by the U.S. Patent and Trademark Office ("PTO") on February 3, 2015. (*Id.*, ex. 2) According to the PTO's records, the mark was first used commercially on June 10, 2014 for "downloadable software for use with mobile electronic devices for the purpose of photo and video capturing and editing; downloadable software in the nature of a mobile application for photo and video capturing and editing, in class 9 (U.S. C. 21, 23, 26, 36 and 38)." (*Id.*))

4. Although plaintiff now describes the "Prizmia®" app as "allow[ing] users to modify photographs or videos with filters that alter the photo's style or add an artistic effect" (D.I. 67 at 3; D.I. 71 at ¶ 13; exs. 3-4), there can be no dispute that plaintiff launched the "Prizmia" app as "[a]n innovative, feature-loaded app that seamlessly connects to your GoPro" camera. Indeed, the app was marketed (including on plaintiff's Facebook page and promotional YouTube videos) as "Prizmia for GoPro." (D.I. 71, ex. 5; D.I. 75, exs. 12-15) More specifically, plaintiff's original webpage from August 20, 2014 described his commercial product as "Prizmia for GoPro - The Video

---

[1]The court will use the designation "Prizmia®" if the document to which the court refers uses that designation, or when it is otherwise appropriate to do so.

2

Filters, Photo Effects, Slow Motion, Live Preview and 4K Sharing App for your Go Pro Camera." (D.I. 75, ex. 13 at 8/8) The marketing material used at its "worldwide" launch touted the "Prizmia" app as a "filmmaking app for GoPro filmmakers," with the most "distinguishing feature" being "its full-screen, real-time preview, which can be seen directly on [an] iPhone, iPad or iPad Touch while filming with "[a]dditional features" such as "more than 40 included professional filters and effects, independent color grading controls for contrast, saturation, gamma and brightness, optical slow motion speed adjustment, live filters preview, Direct GoPro media library access and full control over all GoPro settings and features." (D.I. 71, ex. 5) According to the marketing piece, plaintiff claimed that his "latest achievement, Prizmia for GoPro, has been in stealth development for over 18 months with the singular goal of becoming the very best accessory for GoPro cameras." (Id.) Plaintiff adopted the following logo for his app icon in the Apple App Store:



(D.I. 75, ex. 13 at 8/8)

5. On May 13, 2016, plaintiff pulled the "Prizmia for GoPro" app from the Apple App Store due to a complaint from GoPro, which had sent notice to Apple asserting that the "Prizmia for GoPro" app was infringing GoPro's copyright, trademark and app name. (D.I. 78, ex. 19) Plaintiff rebranded the name of his app from "Prizmia for GoPro" to "Prizmia," and put a new version of the "Prizmia" app on the Apple App Store on July

3

25, 2016. (D.I. 78 at ¶ 35; ex. 30)  The "Prizmia for GoPro" app was only downloaded 47 times in April 2016, and 23 times in May 2016. (D.I. 75 at ¶ 20)  As indicated above, the "Prizmia" app was withdrawn from the Apple App Store from May 13 to July 25, 2016. (D.I. at¶¶ 31-36; exs. 26-30; D.I. 74, exs. 2-3)  There is no evidence of record that plaintiff's product has ever been a commercial success.

6. On or about June 11, 2016, defendant Prisma Labs, Inc. ("defendant") released an app on Apple's App Store and later on the Google Play Store for Android devices.  The record indicates that defendant was started about a year before the Prisma app launched for the purpose of using "neural networks and artificial intelligence to turn a user's photographs into works of art by taking the user's photo and performing image processing to creating a new stylized image that resembles a particular style of art." (D.I. 74 at ¶¶ 2-6)  Defendant markets its product as software that uses artificial intelligence to "transform[ ] your photos and videos into works of art using the styles of famous artists:  Van Gogh, Picasso, Levitan, as well as world famous ornaments and patterns." (*Id.*, ex. 1)  Defendant choose the following logo for its app:



(D.I. 72 at 6)  According to defendant, the word "prisma" means "prism" in Russian. (*Id.* at ¶ 9)  Defendant chose the domain name "prisma-ai.com" for its web domain because its "technology uses artificial intelligence to generate modified images." (*Id.* at ¶12; ex. 1)  Defendant conducted a trademark search before finalizing the name "Prisma," which search (according to defendant) did not turn up the "Prizmia®" mark. (*Id.* at ¶¶ 10-11)

4

7. Defendant's app has been very successful. In the first two weeks of its release, it was downloaded about 2 million times. Since then, it has been downloaded over 70 million times across the world and over 8 million times in the United States. (*Id.* at ¶¶ 17-18) The "Prisma" app has been named "2016 App of the Year" by both Apple and Google Play, and has received substantial praise and publicity from other sources as well. (*Id.* at ¶¶ 19-21; D.I. 71, exs. 9-13)

8. On August 31, 2016, after launching a revised "Prizmia®" app, plaintiff sent defendant a cease and desist letter; plaintiff initiated the instant lawsuit on September 29, 2016 in the United States District Court for the Eastern District of Virginia ("EDVA"). Plaintiff filed his motion for a preliminary injunction on November 22, 2016. (D.I. 17) Finding that it lacked personal jurisdiction over defendant, EDVA transferred the case to the District of Delaware on or about December 27, 2016. Plaintiff renewed his motion for a preliminary injunction on January 20, 2016. (D.I. 66) Briefing (along with the submission of various declarations) is complete, and oral argument has been heard.

9. The parties do not dispute personal jurisdiction, as defendant is a Delaware corporation. The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1338(a). Although plaintiff includes in his complaint allegations of unfair competition, in violation of 15 U.S.C. § 1125(a), the focus of the preliminary injunction motion is trademark infringement.

10. **Standard of review.** As explained by the United States Court of Appeals for the Third Circuit,

> [p]reliminary injunctive relief is an "extraordinary remedy, which should be granted only in limited circumstances." . . . "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is

5

likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." . . . The "failure to establish any element . . . renders a preliminary injunction inappropriate." . . . The movant bears the burden of showing that these four factors weigh in favor of granting the injunction.

*Ferring Pharms., Inc. v. Watson Pharmaceuticals, Inc.,* 765 F.3d 205, 210 (3d Cir. 2014) (citations omitted). "[T]he decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and . . . such discretion must be exercised consistent with traditional principles of equity." *eBay Inc. v. MercExchange, L.L.C..* 547 U.S. 388, 394 (2006).

11. **Likelihood of success on the merits - trademark infringement.** The Lanham Act defines trademark infringement as use of a mark so similar to that of a prior user as to be "likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1). Plaintiff alleges that he is being damaged under the trademark doctrine of reverse confusion. "Reverse confusion occurs when a larger, more powerful company uses the trademark of a smaller, less powerful senior owner and thereby causes likely confusion as to the source of the senior user's goods or services." *Fisons Horticulture, Inc. v. Vigoro Indus.,* 30 F.3d 466, 474 (3d Cir. 1994). "Absent reverse confusion, 'a company with a well established trade name and with the economic power to advertise extensively [would be immunized from suit] for a product name taken from a competitor.'" *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,*, 237 F.3d 198, 228 (3d Cir. 2000) (citation omitted). Reverse confusion results in the senior user losing the value of its mark, its product and corporate identity, control over its goodwill and reputation, and ability to move into new markets. *Freedom Card, Inc. v. JP Morgan*

6

*Chase & Co.*, 432 F.3d 463, 471-72 (3d Cir. 2005).  According to plaintiff, defendant "has created reverse confusion by distributing its similar app, with a similar name, free of charge to 70 million users who might otherwise have purchased [p]laintiff's Prizmia® app if not for the infringement."  (D.I. 67 at 9-10)

12.  Plaintiff has failed to produce any evidence that the doctrine of reverse confusion is applicable to the facts of record.  Defendant is a start-up company with one app that hit the market in June 2016 without a "well established trade name" and with no evidence that it had any "economic power" other than the strength of its product.[2] Without the fundamental premise of the reverse confusion doctrine being proven, that is, defendant's status as a "larger, more powerful company,"[3] the court declines to take this case out of the traditional analytical framework for trademark cases.

13.  The Third Circuit has adopted the "*Lapp* test" to determine likelihood of confusion in the market.  The factors identified in *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460 (3d Cir. 1983) ("the *Lapp* factors" include:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, [even if] not competing, are marketed through the same channels of trade and

---

[2]Unlike plaintiff, who had developed and marketed multiple successful apps over the course of years prior to launching his "Prizmia for GoPro" app.

[3]Indeed, plaintiff asserts (in connection with irreparable harm) that "there is a serious question about [d]efendant's ability to pay any judgment . . . .  Prism has existed for less than a year, gives it app away for free, and has presented no evidence that its app has generated any revenue."  (D.I. 67 at 19)

advertised through the same media; (8) the extent to which the targets
of the parties' sales efforts are the same; (9) the relationship of the
goods in the minds of consumers because of the similarity of function;
(10) other facts suggesting that the consuming public might expect the
prior owner to manufacture a product in the defendant's market, or that
he is unlikely to expand into that market.

*Id.* at 463. "'None of these factors is determinative in the likelihood of confusion

analysis and each factor must be weighed and balanced one against the other.' . . .

'[T]he different factors may properly be accorded different weights depending on the

particular factual setting. A district court should utilize the factors that seem appropriate

to a given situation.' . . ." *Kos Pharms., Inc. v. Andrx Corp.,* 369 F.3d 700, 709 (3d Cir.

2004) (citations omitted). "The *Lapp* factors are best understood as 'tools to guide a

qualitative decision.'" *Id.*

14. **Degree of similarity** *(Lapp #1)*. The similarity of the marks is evaluated by

looking to the "sight, sound, and meaning of the marks to determine whether the marks

create the same overall impression when viewed as a consumer." *A & H Sportswear,*

237 F.3d at 216. Because the test is likelihood of confusion by consumers in the

marketplace, the degree of similarity of the marks is assessed by looking at the marks

as encountered by consumers in the marketplace, keeping in mind that side-by-side

comparisons generally are not appropriate.[4] *See Sabinsa Corp. v. Creative*

*Compounds, LLC,* 609 F.3d 175, 184 (3d Cir. 2010); *A & H Sportswear,* 237 F.3d at

227. It makes sense, therefore, to assess "the overall impression created by the mark

---

[4]Unless consumers typically view the products side-by-side in the normal
channels of commerce. *See Int'l Data Grp., Inc. v. Ziff Davis Media, Inc.,* 145 F. Supp.
2d 422, 434 (D. Del. 2001). It is possible that a search on the Apple App Store could
bring these two marks up on the same page, but there has been no evidence of such.

as a whole rather than simply comparing the individual features of the marks." *Harlem Wizards Entm't Basketball, Inc. v. NBA Props., Inc.*, 952 F. Supp. 1084, 1096 (D.N.J. 1997).

15.  Certainly there is a degree of similarity between the look and sound of the words "Prizmia" and "Prisma."  However, the marketplace presents the two marks very differently, which distinct presentations create distinct commercial impressions.  The icons are very different.[5]  *See Int'l Data Grp.*, 145 F. Supp. 2d at 435 ("[A]lthough there are some similarities between the marks at issue in terms of sound and meaning, the look of the logo and the trade dress distinguish CIO Insight from CIO Insider.").  Additionally, the respective purchase pages on the Apple App Store, from which a consumer would download the parties' apps, create different, distinct impressions.  (D.I. 72 at 2)  Further, the source of each of the apps is clearly identified on each of the purchase pages., that is, i4software is clearly displayed below the PRIZMIA® name on plaintiff's purchase page, and Prisma Labs, Inc. is clearly displayed below the app name on defendant's page.  (*Id.*)  *See Harlem Wizards*, 952 F. Supp. at 1096; *Schmid Labs. v. Youngs Drug Prods. Corp.*, 482 F. Supp. 14, 18 (D.N.J. 1979).  The fact that the PTO found defendant's "Prisma" mark to be confusingly similar to "PRIZMIA®" is not dispositive, given the fact that the PTO does not consider evidence of how marks are used in the marketplace.  *See A & H Sportswear*, 237 F.3d at 221; *Interstate Brands Corp. v. McKee Foods Corp.*, 2000 WL 187204 (T.T.A.B. 2000).  The court

_____

[5]Notably, defendant's triangle icon connotes a prism, while plaintiff's icon more resembles the four rectangles of the GoPro logo.  (*Compare* D.I. 71, ex. 3 with ex. 6 with D.I. 75, ex. 33)

concludes, therefore, that *Lapp* factor #1 weighs in favor of defendant.

16. **Strength of "PRIZMIA®" mark** (*Lapp* #2). In assessing the strength of a mark, the Third Circuit looks to both the conceptual and commercial strength of the mark as viewed in the context of the goods for which it is used. *Fisons,* 30 F.3d at 479. As to conceptual strength, plaintiff's expert concedes that "[t]he words PRIZMIA and PRISMA are both obvious derivatives of the word *prism,* itself borrowed from the Greek work *prisma* . . . ." (D.I. 68 at ¶ 10)  In this regard, defendant has presented credible evidence of the commonly understood meaning of the term "prism," that is, an object that filters light or color, particularly in connection with photography and art. (*See, e.g.,* D.I. 75, exs. 2-7, 9-11*)* Indeed, the term "prism" and "prism"-derivative names have been extensively used by third parties for photo-editing apps. (*See id.*, exs. 17-23) Aside from plaintiff's declaration that in choosing the term "Prizmia," he was "striv[ing] to select [a] non-descriptive, fanciful term[ ]" (D.I. 71 at ¶¶ 12, 14), there is no persuasive evidence that plaintiff succeeded in doing so.

17. With respect to commercial strength, plaintiff concedes that defendant's "Prisma" mark is "commercially significantly stronger than [his] Prismia® mark." (D.I. 67 at 15)  There is no evidence to the contrary.  As asserted by defendant, "[t]his is not a case of a senior user being overwhelmed by a junior user. It is a case of a senior user that could not compete in the market before the junior user ever made an appearance." (D.I. 72 at 13)  For all these reasons, *Lapp* factor #2 weighs in favor of defendant.

18. **Consumer care in purchase** (*Lapp* #3). *Lapp* factor #3 considers "the price of the goods and other factors indicative of the care and attention expected of

consumers when making a purchase." *A & H Sportswear*, 237 F.3d at 234. As noted above, plaintiff charges $7.99 for the "Prizmia®" app; defendant's "Prisma" app is free. Plaintiff argues that "[d]efendant's free distribution of its product has fueled the viral distribution of its product to over 70 million users and accelerated injury" to plaintiff. (D.I. 67 at 15-16) Defendant notes that "[t]he average price of apps in the Apple App Store is $1.01 and the majority of apps are available for free. . . . Consumers of mobile apps understand the difference between a free app and one that charges 8x the price of an average app." (D.I. 72 at 15; D.I. 75, ex. 32) The court finds defendant has the better argument and evidence. *Lapp* factor #3 weighs in favor of defendant.

19. **Evidence of actual confusion**. (*Lapp* #4 and #6). Evidence of actual confusion is not required to prove likelihood of confusion; however, the lack of actual confusion evidence can lead to an inference that continued use will not lead to consumer confusion. *Versa Prods. Co. v. Bifold Co. (Mfg.) Ltd.,* 50 F.3d 189, 205 (3d Cir. 1995). Plaintiff offers the following evidence to support his allegations of actual confusion: (1) the monthly Apple Analytics reports for plaintiff's "Prizmia®" app, which show "a dramatic monthly increase" in the number of consumers who looked at the "Prizmia®" app and "a corresponding decrease" in the number of consumers buying it; and (2) one specific incident of a consumer who "wrongly believed that he had downloaded the Prizmia® app after hearing [plaintiff] pronounce the app name and describe the app." (D.I. 67 at 16) Defendant responds that the statistics demonstrate a lack of confusion on consumers' part, that they have looked at plaintiff's app and made a choice to download (or not) something other than plaintiff's app. Defendant also

11

responds that the specific example of confusion provided by plaintiff reflects more a "fleeting uncertainty" than "actual confusion." *See Versa*, 50 F.3d at 211. Finally, defendant presented survey evidence that not a single participating consumer confused the two apps at issue. (D.I. 73) On the whole, defendant has the more credible reasoning and evidence on these factors. The court concludes that, with at least 70 million downloads worldwide and a lack of persuasive evidence of actual confusion, actual confusion is not likely to occur. *Lapp* factors #4 and #6 weigh in defendant's favor.

20. **Defendant's intent** (*Lapp* #5). This factor weighs in favor of plaintiff. Although the record indicates that plaintiff had withdrawn his app from the marketplace when defendant launched its app, and although there is no evidence that defendant adopted its mark "with the deliberate intent of pushing its rival out of the market," *A & H Sportswear*, 237 F.3d at 225-26, defendant's assertion that a trademark search did not reveal plaintiff's registered mark is not credible.

21. **Competition and overlap** (*Lapp* #7, #8, and #9). At a high level, the parties at bar sell similar apps through the same channels of trade. Upon closer inspection, however, there are distinct differences between the parties' products. In the first instance, the court gives little weight to the fact that both apps are sold on the Internet, as that paints too broad a stroke for a trademark infringement analysis in this context and with respect to the technology at issue. Moreover, despite plaintiff's description of how a search is conducted on the Apple App Store, a search for plaintiff's "Prizmia®" app does not turn up defendant's app, and a search for defendant's "Prisma" app turns

12

up numerous additional apps but not plaintiff's. In terms of functionality, this factor is somewhat of a moving target, as plaintiff's app was designed with the "singular goal of being the best accessory for GoPro cameras," but has been touted in this litigation as an app that focuses on "professional and unique filters." (D.I. 71 at ¶ 13 and ex. 3) The focus of defendant's app has remained unchanged and is fundamentally different in function; while plaintiff broadly describes both apps as distributing "photo filtering apps, the record demonstrates that defendant's app analyzes photos using artificial intelligence technology and then redraws the photos in a chosen artistic style, resulting in machine generated art. Given these very real differences in functionality, it stands to reason that the two products are directed to different consumers. *Lapp* factors #7, #8 and #9 weigh in defendant's favor.

22. **Conclusion as to likelihood of success on the merits.** Based on the above analysis, the court concludes that plaintiff has not carried his burden to demonstrate that defendant's "Prisma" mark is so similar to plaintiff's "Prizmia®" mark as to likely cause confusion in the marketplace. Therefore, plaintiff has also failed to carry his burden of proving that he is likely to succeed on the merits of his trademark infringement claim.

23. **Irreparable harm.** In a Lanham Act case, "[g]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill." *Groupe SEB United States, Inc. v. Euro-Pro Operating LLC,* 774 F.3d 192, 204 (3d Cir. 2014) (citation omitted). In this regard, plaintiff argues that defendant is a "larger more powerful company" that has interfered with the value of plaintiff's trademark, even while

defendant is a new company with no revenue.  (D.I. 67 at 19)  As explained above, the court has rejected the notion that defendant is a larger, more powerful company; it simply launched a more successful product.  There is no evidence of record that plaintiff has lost any value in his trademark because of the "Prisma" app - neither loss of trade or of goodwill.  Plaintiff has not carried his burden in this regard.

24.  **Balance of harms.**  In balancing the equities between the parties, the court "must balance the competing claims of injury and must consider the effect on each party of granting or withholding the relief requested."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  In this case, plaintiff had *de minimus* sales of his "Prizmia®" app, both before and after defendant's launch.  Unlike the record reflective of defendant's app, there is little evidence of any goodwill attributable to the "Prizmia®" app.  (*Compare, e.g.,* D.I. 75, ex. 16 with D.I. 71, exs. 9-13)  With respect to the public's interest, although the public certainly has a strong interest in protecting valid trademarks, it also has an interest in promoting innovation.  Considering all of the above, the balance of harms weighs in favor of defendant.

25.  **Conclusion.**  Weighing all of the factors discussed above in the totality of the circumstances, *see Kos Pharms.*, 369 F.3d at 711, the court concludes that plaintiff has not carried his burden to demonstrate that the extraordinary remedy of a preliminary injunction is warranted on the record presented.  Plaintiff's motion is denied.  An order shall issue.

Senior United States District Judge

14